# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

CARL LEROY COMBS,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

        Defendant.

No. C06-4061-PAZ

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the court on judicial review of the defendant's final decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The plaintiff Carl Leroy Combs filed his application on August 15, 2003, alleging he has been disabled since May 30, 2002, due to an injury to his neck and right arm, difficulty reading and writing, high blood pressure, depression, and placement of a stent in his heart in 1997. Combs's application was denied initially and on reconsideration.

A hearing was held before Administrative Law Judge ("ALJ") John P. Johnson on May 5, 2005, in Sioux City, Iowa. Attorney Dennis J. Mahr represented Combs at the hearing. Besides Combs, witnesses included his wife Michelle Combs and Vocational Expert ("VE") William V. Tucker. On December 21, 2005, the ALJ found Combs was not disabled, nor had he been disabled at any time through the date of the decision. Combs

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). The court previously substituted Linda S. McMahon as the defendant in this action when she became Acting Commissioner of the SSA. On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

appealed the ALJ's ruling, and on May 26, 2006, the Appeals Council denied Combs's request for review, making the ALJ's decision the final decision of the Commissioner.

Combs filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On February 7, 2007, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues thoroughly, and the matter is now fully submitted and ready for review.

## I. REVIEW OF THE ADMINISTRATIVE RECORD

The administrative record in this case is voluminous, comprising some 1659 pages. However, the record contains medical evidence dating back to 1976, when Combs was only eighteen years of age. Combs alleges he became disabled in 2002, at age forty-three. The court finds that for the most part, medical records preceding the year prior to Combs's alleged disability onset date are irrelevant to his claim for benefits.

### A. Background information and Combs's subjective complaints

Combs was born in 1958. He is 5'8" tall and weighs about 272 pounds. He completed the 10th grade in school and then left school to go to work. He has poor reading and comprehension skills, as well as difficulty comprehending and processing verbally-presented information. He has a full scale I.Q. of 80 and processes information very slowly. He never attempted to get a G.E.D.

After leaving school, Combs worked in construction for four years. The job required frequent heavy lifting, including sixty- to eighty-pound bags of cement, and jackhammers weighing more than ninety pounds. Combs stated he lifted as much as 175 pounds on occasion.

He then worked for John Morrell as a meat cutter for fifteen years. The job required him to lift 120-pound pork loins from a conveyor belt to a pallet. He left John

2

Morrell after he suffered a "bulged disc in the middle of [his] back." According to Combs, his doctor put him on lifting, bending, and squatting restrictions, and Combs thought John Morrell "just wanted to get rid of [him] after the injury."

Combs also worked for Orkin for six to eight months in 1994, spraying chemicals to kill "roaches, insects, spiders, [and] termites." He was sick frequently while he had the job, and he attributes this to his inability to read the chemical labels and mix the chemicals together properly. The job required him to crawl under houses at times. He also did yard work for a few months, caring for four or five people's yards in his neighborhood.

After leaving John Morrell, Combs went back to construction work. He received training and was certified to operate a forklift and a Bobcat. His primary job was operating heavy equipment, which required little lifting, but he also worked frequently as a "pick-off man," lifting items from the top of a conveyor belt. The job required him to lift fifty to eighty pounds frequently. Combs was hurt at work on May 30, 2002, while he was attempting to dislodge a rock that was stuck in the conveyor belt. He stated he felt a pop in his left shoulder and "it felt like something ripped in [his] shoulder." He had surgery on his shoulder, but he has never felt physically able to return to work.

Since his injury, Combs has developed diabetes and high blood pressure, and he takes medications for those conditions, as well as for pain and depression. Side effects he experiences from his medications including confusion, fatigue, loose stools, frequent urination, and occasional incontinence. He has phlebitis in his left leg, a condition he has had since about 1984, and he stated his leg will swell up, throb, and turn black and blue. He wears support stockings for the disease. He can stand for up to two hours at a time, but then he will have to sit down and elevate his leg. Standing also causes pain in his neck, for which he uses ice packs several times a day and takes pain medication. He also uses a traction device once per day at home, which he stated helps relieve the pressure on

his neck. According to Combs, his doctors have indicated he is not a good candidate for neck surgery at this time because they cannot guarantee surgery would solve his problem.

Combs stated he has gained sixty-two pounds since his injury. He attributes the weight gain to his inability to move around as well or be as active as he was before the injury, and to the fact that he tends to eat more when he feels depressed. He indicated he feels depressed because he is unable to do things he used to enjoy. He has three sons, one of whom is just starting to play baseball, and Combs is unable to play catch with his son. He also used to enjoy swimming, fishing, hunting, bowling, golf, and riding a bicycle, but he is no longer able to engage in any of those activities due to the pain in his neck, shoulder, and legs.

Combs stated he used to help his wife with housework, and he used to fix things around the house. Since his injury, he can wash a few dishes and take out the garbage, but he is unable to make the bed, vacuum, or do any heavy cleaning. He indicated family members help with the yard work, shopping, cleaning out the gutters, and other tasks he used to do before his injury, and he now has to hire others to fix plumbing and electrical problems, change out the water heater, and do repair jobs he used to do himself. He estimated he can lift five to ten pounds frequently, and up to twenty pounds occasionally.

Combs estimated he can sit for thirty to forty-five minutes at a time before his neck, back, and legs cramp up and begin hurting. (The court notes he asked for permission to stand up a short while into the ALJ hearing.) He tried to go to a movie in a theater but he could not sit through it due to pain in his neck and back. He also has difficulty driving due to his neck problems. He stated he is unable to turn his head easily, and it causes him to become agitated when he drives. Since his accident, he has only driven seven to eight miles from his home to go to doctors' appointments and physical therapy.

Combs stated he does not sleep well. He has a C-PAP machine for sleep apnea, but he sometimes awakens during the night to find himself throwing the machine off. He also

4

awakens due to pain and cramping in his neck and shoulder. He estimated he sleeps four or five hours at a time without waking.

On a typical day, Combs will get up, take his medications, eat breakfast, and dress. He will either go to physical therapy for his neck and shoulder, see his doctor, or see his counselor. He takes a nap every day. His wife gets home from work at around 2:00 p.m., and then they sometimes go for a walk or a drive, go visit his wife's father, or go to the store. In the evening, if he is able, Combs and his wife may play cribbage or cards, or walk two blocks to see a ball game at a local college. Otherwise, Combs spends most evenings on the couch with an ice pack.

Combs stated he feels depressed because he is doing everything his doctors tell him to do to get better, and he does not understand why things are happening to him. He stated he seldom visits relatives because he is uncomfortable and he will blow up at people. He and his wife flew to California for a wedding, and Combs left early because he was uncomfortable around all the people. He is a member of a church and attends church with his wife regularly, but he sits in the back so no one will notice him or talk to him. He stated he is uncomfortable around people and is prone to get irritated and say the wrong thing. For this reason, he indicated he would be unable to maintain a job as, for example, a store clerk, where he had to deal with strangers all day.

Combs stated he gets angry much more easily than he did in the past. He has had thoughts of suicide, and at one time planned to hang himself in his garage. He stated his love for his wife and children stopped him from following through with the plan. He has seen a counselor and takes antidepressants, which are helping to alleviate his suicidal thoughts. He experiences feelings of guilt and worthlessness, and he has difficulty concentrating. He stated he is unable to concentrate well enough to watch a TV movie and follow the plot all the way through.

5

Combs opined there is no job he could do on a full-time basis, forty hours per week, because of his various physical problems. He is unable to bend over from the waist without becoming lightheaded and getting a headache. He can kneel or stoop down, but has difficulty getting back up. He can crawl a short distance. He can climb stairs if he has something to hold onto. After his injury, he had problems with his grip strength, but he stated that since his shoulder surgery, his grip strength is beginning to improve. He has been in physical therapy for his neck and shoulder.

Combs's wife Michelle testified she works five days per week as a bookkeeper and assistant front end manager at a local grocery store. She is uncomfortable leaving Combs at home alone because Combs gets "really agitated." She indicated his agitation has worsened since his accident. Combs's counselor directed him to tell his wife about his suicide plans. Until then, Michelle had been unaware that Combs was contemplating suicide. A week prior to the ALJ hearing, when she and Combs were in California for the wedding, Combs became tearful and upset because he wanted to leave the event early, and he talked about suicide at that time. Michelle skipped activities with her family because she feared leaving Combs in the hotel alone. She stated Combs becomes temperamental, moody, and aggravated frequently, and she sometimes feels she has to watch what she says and does around him.

Michelle echoed Combs's statement that he is no longer able to help around the house. She stated he used to help carry laundry for her, put things away in the kitchen, make the bed, and vacuum, but if he does those things now, it causes pain in his neck. She stated Combs uses an ice pack on his neck at least three or four times a day. He also uses heat on his neck at times.

Michelle has observed that Combs appears to be paranoid. If they go out to eat, he will look around to see who is looking at him or talking about him. According to her, Combs thinks everyone is watching him. Michelle stated Combs's paranoia is something

6

that developed after his accident. She stated his discomfort around people extends to family members. According to Michelle, Combs used to come to family gatherings, eat dinner, and then play cribbage or poker after dinner. Now, he usually drops her off early, comes back just to eat dinner, and then lies down in another room or goes home. He sometimes will go with her to play cribbage with her father.

## B. *Combs's medical history*

Combs has numerous medical conditions for which he receives ongoing treatment. The court finds it beneficial to discuss each condition separately, rather than presenting an all-encompassing chronology of his medical treatment.

### 1. *Heart disease*

Combs suffered a heart attack in August 1997. He underwent cardiac catheterization with stent placement in his left anterior descending artery. He was seen annually for followup until 2004, when he was told to return in two years for followup. Following the heart attack, he stopped smoking and began chewing tobacco, and he gained about twenty-eight pounds. The record does not indicate Combs has had further cardiovascular episodes. He and his wife apparently suspected a cardiac episode in December 2005, when Combs experienced some chest pain. He was examined in the emergency room and doctors noted his left lateral chest wall was painful on palpation. Combs opined the pain was musculoskeletal, and he noted he had been using a ten-pound barbell during exercise. He was diagnosed with chest wall pain syndrome, and doctors prescribed Ibuprofen, Flexeril, and Lortab. They also directed him to discontinue use of the barbell.

### 2. *Hypertension and Diabetes Mellitus Type II*

Combs has been treated for primary hypertension since at least 2001. Records indicate his blood pressure is well controlled on medication.

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 7 of 48

Combs was diagnosed with Diabetes Mellitus Type II in 1999. He has been followed regularly by doctors for his diabetes. His blood sugars have fluctuated somewhat over the years, largely due to Combs's difficulty maintaining a proper diet and keeping his weight down. His blood sugars have remained under reasonable control on his medications, but still were in the 140 to 150 range as of December 2005. There is no evidence that Combs has suffered any of the many serious physical consequences that often result from diabetes.

### 3. Obesity

The evidence indicates Combs has had a great deal of difficulty controlling his diet and weight gain. His weight has increased from 210 pounds in 1993, to 285 pounds in November 2005, with frequent fluctuations in between. His weight gain has been attributed to smoking cessation, inactivity and inability to exercise due to his neck and leg problems, and excessive eating due to depression. As of November 2005, doctors were considering the possibility of gastric bypass surgery as a means to control Combs's weight, but it does not appear that Combs has had the surgery.

### 4. Obstructive Sleep Apnea

Combs was diagnosed with obstructive sleep apnea in February 2000, following a sleep study. A C-PAP machine was prescribed, and the evidence indicates the machine is helpful when Combs uses it; however, he sometimes pulls it off in the middle of the night. Even when he uses the C-PAP as directed, Combs still complains of fatigue and he takes a daily nap. It is not clear from the record whether his ongoing fatigue is the result of sleep apnea, his depression, his chronic neck pain, or a combination of all of his conditions.

8

## 5.    *Thrombophlebitis*

Combs indicated he has worn supportive stockings for phlebitis since about 1984. In May 1989, Richard L. Budensiek, D.O. diagnosed Combs with superficial thrombophlebitis of the left leg, as well as "a condition called venous incompetence of the left leg which [makes] him more susceptible to thrombophlebitis." Due to Combs's condition, the doctor suggested work restrictions for Combs including no more than one hour of standing in one position at a time, and the ability to walk around as needed. The doctor indicated prolonged sitting or standing would predispose Combs "to developing recurrent thrombophlebitis and worse complications of the leg including stasis dermatitis which is a chronic skin condition causing ulcerations[, or] [p]hlegmasia alba dolens and p[h]legmasia cerulea dolens[, . . .] other skin conditions which are complicated by recurrent thrombophlebitis." Dr. Budensiek released Combs to return to work as of May 26, 1989, but he noted that unless Combs was transferred to a job that allowed him to walk around, not standing for more than one hour at a time, then he would be "disabled indefinately [sic]."

Combs's work schedule and lifestyle were continuing to have a negative effect on his condition more than ten years later. He saw Nancy Schenk, M.D. on May 12, 2000, complaining that his legs had been very swollen. The doctor observed bilateral pitting edema on both of Combs's feet up to just below the knee. She prescribed Plendil, which she indicated had worked previously, and also Hydrochlorothiazide. She recommended Combs lose weight, eliminate alcohol, watch his diet, and "get better control of his working hours." She wrote a note to Combs's employer in which she stated Combs "as a medical necessity needs to take it easier, take more breaks and get more rest. If he doesn't he's going to be taken off work."

Combs continued to be treated periodically for chronic venous statis and edema. On October 30, 2003, consulting examiner J.S. Burgfechtel, M.D. noted Combs's left calf

9

was one inch larger than his right, his left leg and ankle were mildly discolored, and he "had some mild to moderate varicosities." However, there was no evidence of pitting edema at that time. In August 2005, Dr. Schenk observed that Combs's left leg was almost twice the size of his right leg, with skin discoloration up to his knee and significant varicose veins around his ankle. She prescribed Lasix as needed, and ordered new support stockings for him. When Combs returned for followup on December 6, 2005, the doctor noted Combs had not been taking the Lasix and his left leg was somewhat swollen, with some pitting edema. The doctor advised Combs to take the Lasix at least once or twice weekly to keep his left leg stable.

### 6. Neck, Shoulder, and Back Problems

Combs suffered several injuries to his back during the course of his employment with John Morrell. The injuries occurred in the late 1980s and early 1990s, well before the time period at issue in this case. Particularly notable is a January 1993 diagnosis by Leonel H. Herrera, M.D., a doctor who saw Combs at the request of John Morrell. Dr. Herrera diagnosed Combs with "[d]egenerative joint disease and degenerative disc disease of the lumbar spine and the thoracolumbar junction"; "[s]acroiliac degenerative joint disease"; and "[r]ecurrent muscle strains." He imposed permanent work restrictions on Combs that included a light-to-medium physical demand classification; ability to use arm and foot controls and to balance without restriction; lifting restriction of thirty-five pounds occasionally, with no constant lifting; no pulling on a constant basis; pushing up to forty pounds on a constant basis; carrying up to eighteen pounds on a constant basis; overhead lifting of no more than twelve inches and fifteen pounds; sitting for up to two hours at a time; occasional bending, squatting, kneeling, and crawling; frequent walking, reaching, and climbing; and standing for up to one-and-a-half hours at a time before needing a break.

10

John Morrell was unable to provide Combs with work that met these restrictions, and Combs's employment was terminated on August 31, 1993. Combs filed a worker's compensation claim in connection with his back condition. A stipulated settlement between Combs and John Morrell, filed December 20, 1993, indicated Combs had an 18% "industrial disability" to the body as a whole.

Combs continued to suffer minor injuries to his neck and back over the course of his employment in the construction industry. An MRI of his cervical spine performed on September 13, 2000, revealed degenerative spondylosis at C4-5 and C5-6, producing moderate right neuroforaminal stenosis at C4-5 and mild right neuroforaminal stenosis at C5-6; and a moderately-sized broad base right posterior central disc herniation at C7-T1, with possible compression of the C8 nerve root.

On May 30, 2002, Combs wrenched his neck while he was working on a rock crusher. He felt no pain initially, but awoke the next morning with difficulty moving his neck. An x-ray of his cervical spine showed "[m]inimal anterior osteophyte formation," and intervertebral disc space narrowing at the C4-5 level. Dr. Schenk indicated the degenerative changes in Combs's neck were not new, but his neck injury at work could have exacerbated his problems. She prescribed Ibuprofen, Flexeril, and Hydrocodone, and ordered an MRI. Overall findings from the MRI were similar to the September 2000 MRI. Dr. Schenk prescribed a soft collar and light physical therapy, and kept Combs off work for a week-and-a-half.

Combs continued to complain of neck pain that was interfering with his sleep, despite pain medications. On June 25, 2002, Dr. Schenk stopped Combs's physical therapy and referred him to neurosurgeon Michael J. Giordano, M.D. for further evaluation. Combs saw Dr. Giordano on July 11, 2002, for evaluation. The doctor found

Combs had a positive Spurling's sign,[2] especially on the left; "full bulk, power, and tone throughout all extremities tested"; and bilaterally symmetric reflexes. He diagnosed Combs with cervical spondylitic neck pain and radiculopathy, and ordered an EMG of Combs's upper extremities "to assess which dermatomes are most affected." (R. 1254) Combs's EMG study was normal, with "no evidence of active cervical radiculopathy, carpal tunnel syndrome, or additional focal nerve compression."

Combs returned to see Dr. Giordano on August 29, 2002. He continued to complain of neck pain, although he stated the pain was somewhat better than at his last examination. Dr. Giordano noted Combs's subjective symptoms were consistent with radiculopathy, but it was "difficult to demonstrate these neurophysiologically." He prescribed further physical therapy for a few weeks before considering any surgical solutions. Combs had physical therapy from September 4, 2002, through October 16, 2002. He saw Dr. Giordano again on October 17, 2002, and reported that the physical therapy was making him worse. He complained of "quite a bit of bilateral arm pain, numbness, and tingling radiating from his neck," with worse pain on the right than on the left. Dr. Giordano listed Combs's options as further physical therapy, epidural steroid injections, or surgery. He noted anterior disc surgery with fusion probably would relieve Combs's arm symptoms, but might not completely relieve his neck pain.

Combs chose to go forward with the surgery, but his worker's compensation carrier refused to authorize the surgery. The carrier sent Combs to see Stephen E. Doran, M.D. for a second opinion. Combs saw Dr. Doran on November 19, 2002. The doctor found Combs's range of motion of the cervical spine to be limited in all directions, with no tenderness on palpation and negative Spurling's sign; full range of motion of his shoulders with no crepitus or tenderness bilaterally; and normal strength, reflexes, sensation, muscle

---

[2]Spurling's test is used for evaluation of cervical spine radiculopathy. A positive Spurling's sign indicates the exacerbation of pain when the patient extends his neck and rotates his chin toward each side.

Case 5:06-cv-04061-PAZ    Document 20    Filed 09/20/07    Page 12 of 48

tone and bulk bilaterally of his upper extremities, except that his deep tendon reflexes were somewhat below normal in his biceps and triceps bilaterally. Dr. Doran noted his concern that Combs's MRI report did not describe any left-sided nerve root compression when Combs exhibited bilateral equal arm symptoms. He planned to review Combs's films himself, and if he did not see any left-sided nerve root compression, then he planned to recommend a cervical myelogram and post-myelogram CT scan prior to proceeding with any surgery.

Combs underwent a CT scan and cervical myelogram on December 10, 2002. The CT scan was limited and inconclusive. Combs's cervico-thoracic junction and C7-T1 disk level could not be visualized well due to Combs's broad shoulders. A repeat MRI with anesthesia at a high field magnet was recommended. Similarly, because of Combs's "very broad shoulders," all views could not be visualized on the myelogram. The myelogram revealed spondylotic degenerative changes at C3-4 and C4-5 ventrally; ventral defects at C2-3, C3-4, and C5-6; and a small defect at C6-7.

Combs saw Dr. Giordano again on January 14, 2003. Combs reported his pain was limited to his neck at that time, with no radicular symptoms, and the doctor felt cervical surgery was not indicated, noting there was not an appreciable chance the surgery would relieve Combs's symptoms and actually could make his neck symptoms even worse. Dr. Giordano discussed Combs's case with his worker's compensation case manager, and recommended Combs have a functional capacity evaluation ("FCE"). The doctor noted, "This patient will be disabled from the type of work that he does permanently. He is a jackhammer operator, and I think that this is detrimental to his spinal condition."

On January 28, 2003, Combs saw Terry Nelson, P.T. for the FCE. Combs was unable to complete portions of the FCE. He evidenced signs of general deconditioning in his upper back and cervical posture. Although he exhibited "signs of holding, splinting or guarding postures of the entire upper back and cervical area during gait activities,"

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 13 of 48

these signs appeared to improve with distraction. His range of motion testing was considered invalid. The evaluator felt Combs "demonstrated a poor correlation between movement patterns and his complaints of pain," noting Combs's "movement patterns improved with distraction throughout the functional capacity evaluation." Overall, the evaluator found Combs had exhibited a submaximal effort throughout the FCE. As a result, he indicated the FCE results "will not provide an aid in the medical management and vocational planning for this patient." Based on the questionable FCE results, Dr. Giordano assigned Combs a 16% impairment of the whole person. He recommended Combs be limited permanently to ten pounds static lifting and five pounds repetitive lifting, and he should not climb ladders or crawl. The doctor further indicated, again based on the FCE results, that Combs would have a "very limited ability to do any repetitive work other than some light work with his hands."

Combs saw Dr. Schenk for followup on March 13, 2003. He had been taking Lortab at night, and then once during the day as needed, and he indicated he wanted to get better control of his pain. He stated his worker's compensation case manager was going to send him to see a chronic pain specialist. Dr. Schenk refilled his Lortab and Ibuprofen, and directed Combs to let her know if his worker's compensation carrier did not get him scheduled to see a pain management specialist.

Combs underwent a second FCE on April 17, 2003. He was cooperative and displayed a good effort. He passed 84% of his validity criteria, and the testing results were noted to be a valid representation of his current functional abilities. Although he exhibited minimal symptom exaggeration, this "did not affect his ability to give consistent effort during the evaluation." The evaluator found Combs could lift thirty-five pounds occasionally, and fifteen to twenty pounds frequently, with no constant lifting; sit and stand/walk frequently, but with intermittent altering of his position; occasionally lift overhead; frequently perform material handling; frequently reach and use his arms; kneel

14

or crawl occasionally; climb, squat, and walk frequently; and bend/stoop and balance constantly. The evaluator recommended Combs avoid prolonged neck postures at the extremes of his neck motion; quick, jerking neck and arm movements; and prolonged holding/reaching with his arms fully extended away from his body above shoulder height. Overall, Combs's functioning placed him in the light-medium physical demand category. Dr. Giordano reviewed the valid FCE and stated his previous assignment of 16% impairment of the whole person was unchanged by the FCE's results. He further stated Combs should be able to work as stated in the FCE report.

Combs continued to complain of neck pain. In August 2003, he returned to see Dr. Schenk, complaining of continual pain that disrupted his sleep to the point that he was buying Valium "off the street to try to calm himself down." He was taking enough Lortab and Ibuprofen every day that it was causing him chronic stomach problems. The doctor switched Combs's pain medications and directed him to take medicine only for moderate to severe pain. She prescribed Amitriptyline at night to help him sleep, as well as to relieve some of his chronic pain. She indicated Combs had been taking enough Valium that it would be unwise for him to stop "cold turkey," and she recommended a slow decrease of the Valium. Combs indicated he would "do his best." She also started him on Prozac, noting she had to address his mood before addressing pain management more aggressively. She further noted Combs would benefit from vocational rehabilitation, but she opined he would need several weeks to get himself psychologically in line before he could commit to that type of program.

On October 30, 2003, Combs was examined by J.S. Burgfechtel, M.D. at the request of the state agency. The doctor noted Combs had "some right shoulder stiffness and soreness in addition to his neck pain." Combs stated he believed he could probably walk as far as he wanted to and sit without problems, but he reported chronic neck pain at a level of seven on a ten-point scale, exacerbated by lifting and neck movement. The

15

doctor also noted Combs continued to drink alcohol despite his history of alcoholic treatment. On examination, the doctor noted some mild crepitus in Combs's right shoulder, although the shoulder moved reasonably well. He noted no gross impairment of movement or function in any of Combs's extremities.

Dr. Burgfechtel reached the following conclusions regarding Combs's functional capacity:

> Lifting and carrying restrictions seem reasonably accurate at 30 lbs occasionally and less than that with somewhat more frequency. Strength in his upper extremities does seem reasonable. Standing, moving, walking about and sitting are basically accomplished. Stooping, climbing, kneeling and crawling would be marginally handled with chronic neck stiffness and discomfort such as lifting things above shoulder level, having to tilt or turn his head, etc. Otherwise handling objects, seeing, hearing, speaking and traveling did not seem grossly impaired.

An x-ray of Combs's right shoulder taken on November 21, 2003, showed "[c]alcification in the tendon, lateral aspect of the shoulder joint," but otherwise was within normal limits.

Combs saw Dr. Schenk on December 4, 2003, for followup. He reported ongoing pain in his neck and also in his right shoulder. He stated his shoulder would "get[] stuck if he raise[d] it above his head." He was taking Hydrocodone more frequently to address the pain. He indicated Celebrex, which the doctor had prescribed previously, was upsetting his stomach, and the Amitriptyline was giving him "a little hangover." Dr. Schenk discontinued Flexeril, which she noted was not working. She added Nexium, decreased the Celebrex dosage, continued the Hydrocodone up to three times daily, and decreased the Amitriptyline. At Combs's next followup on January 15, 2004, he continued to complain of pain in his right shoulder, preventing him from sleeping at night. Dr. Schenk ordered an orthopedic consult.

16

X-rays of Combs's right shoulder taken on January 19, 2004, showed some "calcification superimposed on the edge of the greater tuberosity, external rotation view, most consistent with calcific tendinitis at supraspinatus tendon insertion."; "[m]ild spurring and hypertrophic change at the AC joint, both at the top of the clavicle and to a lesser extent of the acromion. Limited demonstration of the AC joint superior aspect."; and no evidence of fracture or dislocation. Dr. Schenk recommended a steroid injection in Combs's shoulder.

Combs saw Steven Stokesbary, M.D. on January 22, 2004. Dr. Stokesbary noted Combs's right shoulder x-rays showed some early degenerative changes of the AC joint. He administered an injection of Depo Medrol and directed Combs to continue taking anti-inflammatory medications. The doctor noted that if Combs did not get significant relief from the injection, he could be a candidate for arthroscopic decompression. When Combs next saw Dr. Schenk on February 20, 2004, he reported that the shoulder injection had made him feel much better, and his shoulder pain was about a four on a ten-point scale. His neck pain was still flaring up. Dr. Schenk referred Combs to John Cook, M.D. for pain management in his neck, noting the referral would have to be approved by Combs's worker's compensation insurer.

Combs returned to see Dr. Schenk on March 24, 2004. The authorization for him to see Dr. Cook was still pending. Combs's shoulder was bothering him again, causing his sleep to be disturbed. Dr. Schenk referred him to Dr. Stokesbary for followup. Combs saw Dr. Stokesbary on March 25, 2004, and reported that his shoulder was doing much better since his January 2004 injection. He complained of occasional achiness and soreness with certain movements, but otherwise he was quite pleased with the results of the injection. No further treatment was provided at this visit.

Combs saw Dr. Cook on May 25, 2004. Dr. Cook diagnosed Combs with right side cervical radiculopathy at C5-6. He administer a cervical epidural steroid injection at

C5-6 right for Comb's neck and shoulder pain. Combs went to an urgent care clinic on June 6, 2004, complaining of bilateral neck pain with no radicular pain, numbness, weakness, or tingling of the arms. His grip strength was strong and symmetric, light sensation was intact, and deep tendon reflexes were symmetrical. A Toradol injection was administered and Combs was directed to follow up with Dr. Cook for a repeat cervical epidural flood. On June 7, 2004, Combs went to see Dr. Schenk complaining that he could not stand the pain and muscle spasms in his neck. He stated the Toradol injection had done nothing to relieve his pain. Dr. Schenk prescribed a Medrol dose pack and increased Combs's Celebrex dosage. She opined Combs could have nerve root impingement. Combs returned to see Dr. Cook on June 24, 2004. Combs stated his neck pain was at a six on a ten-point scale. Dr. Cook recommended physical therapy, traction, and home exercises. Combs attempted to see a chiropractor, but his worker's compensation case worker told him chiropractic treatment would not be authorized.

Combs returned to see Dr. Schenk on July 14, 2004. He was doing traction at home as prescribed by Dr. Cook, and stated it was painful but he hoped it would be helpful. He continued to take Hydrocodone about three times daily along with his Celebrex. The doctor noted Combs's medication might have to be changed to OxyContin in place of the Hydrocodone, and his Tylenol dosage might have to be reduced, because Combs's liver was "irritated." Combs saw Dr. Schenk again on August 27, 2004, complaining of continued pain in his right shoulder and ongoing cervical neck pain. The doctor scheduled Combs to continue his traction with a physical therapist, rather than at home, to address Combs's discomfort that the traction device reminded him of a rope around his neck. Combs was evaluated by the physical therapist on August 30, 2004. He rated his cervical pain at seven on a ten-point scale, increasing to a ten when he turned his head in either direction. He was scheduled for physical therapy three times per week for four weeks.

18

Combs saw Dr. Schenk again on September 17, 2004. He complained of continued right shoulder and neck pain, and difficulty sleeping. The doctor noted Combs's appointment with Dr. Stokesbary had been cancelled due to "billing reasons." Combs stated he was getting some relief during the traction and physical therapy, but after the procedure was over, his neck fell back into the "old positioning" and continued to cause him pain. He was still taking Hydrocodone and Celebrex, but was having breakthrough pain in spite of the medications. The doctor prescribed OxyContin on a schedule to wean Combs off the Hydrocodone. Dr. Schenk opined that a repeat MRI of Combs's shoulder was warranted.

Combs saw Dr. Stokesbary again on September 28, 2004. Combs complained of significant shoulder pain that caused him sleep disturbance. On examination, the doctor noted Combs had full passive motion, a "very positive impingement sign," and positive Hawkins sign, which tests for rotator cuff injury and shoulder impingement. The doctor noted Combs might require arthroscopic surgery, and he planned to see Combs again after his MRI.

The MRI of Combs's right shoulder was performed on October 7, 2004. The radiologist noted the following impressions from the MRI: "Partial tear at bursal aspect of supraspinatus tendon insertion"; "Tendinopathy of the more proximal supraspinatus tendon"; "Small effusion in the subacromial subdeltoid bursa"; and "Mild degenerative disease with inferior spur at the acromioclavicular joint."

Combs saw Dr. Schenk for followup on October 8, 2004. He was upset because the worker's compensation carrier was directing him to see a different doctor for further treatment of his work-related injury. Dr. Schenk continued Combs's OxyContin and told him to return in two weeks for followup of his other medical problems.

On October 14, 2004, Combs saw Dr. Stokesbary to discuss his MRI findings. The doctor indicated the MRI showed partial thickness tearing of the rotator cuff. He

19

recommended right shoulder arthroscopy with decompression and probable open rotator cuff repair. Combs underwent the procedure on October 29, 2004. His post-surgical diagnoses were "[r]ight shoulder labral tear and biceps tendon partial rupture." Combs was discharged the following day in stable condition, with his arm immobilized in a sling. He saw Dr. Schenk on November 3, 2004, and stated he was taking two Hydrocodone every four to six hours, plus OxyContin for his neck pain. The medications were causing him some stomach upset and constipation. He stated his shoulder pain was better, although his arm was largely immobilized in the sling.

Combs saw Dr. Stokesbary for followup on November 9, 2004. He was noted to be "doing reasonably well," with no major problems or complications. He was able to perform some gentle pendulum motions without much pain. He was directed to continue wearing the sling. At his next followup visit, on November 30, 2004, he stated he was a bit stiff and sore and he was tired of the sling. Dr. Stokesbary noted some mild swelling in the deltoid. He discontinued the sling and prescribed physical therapy to work on Combs's range of motion.

Dr. Schenk saw Combs on December 2, 2004. She noted his surgical site had "filled with fluid," slowing Combs's progress in physical therapy. She noted Combs could "bring his arm up on his own to about 90 degrees but no further." Combs continued to complain of chronic cervical neck pain. The doctor to whom the worker's compensation carrier had referred Combs apparently had evaluated him, determined "everything was being done appropriately and dismissed the case." As a result, no one was seeing Combs for his neck pain on behalf of the comp carrier. Dr. Schenk continued to refill Combs's OxyContin and Hydrocodone prescriptions, noting no good substitute for the pain medications had been found and Combs was "in such severe pain."

Combs saw Dr. Stokesbary on January 4, 2005, for followup. Combs had "about 90% normal movement in forward flexion and abduction," but still exhibited tenderness

20

with external rotation and extension. He reported minimal pain and was no longer taking Lortab. The doctor prescribed another four weeks of physical therapy.

When Combs next saw Dr. Schenk, on January 6, 2005, he stated he was doing well and had improved greatly. He still reported having pain, but he was working through it with exercise, positive attitude, and trying to do things in spite of the pain. His shoulder was feeling better, and he was able to turn his neck. He was only taking pain medication if his pain was severe. Combs saw the doctor again on February 3, 2005, and reported his shoulder was feeling good. He was experiencing some achiness and soreness in his neck. He also had pain over the lateral side of his left elbow, and noted it hurt to move his arm. On examination, the doctor noted Combs had excellent range of motion of his shoulder with near full forward flexion and abduction, some moderate weakness, and some remaining tenderness over the biceps tendon. Combs was directed to continue with the physical therapy. The doctor injected Combs's left elbow with DepoMedrol and Lidocaine.

Combs saw Dr. Schenk on February 17, 2005, and reported his neck pain had been flaring with the physical therapy on his right shoulder. He was taking one Hydrocodone in the morning and one at night. and he was trying to focus on things other than pain.

Combs saw Dr. Stokesbary again on March 10, 2005. The doctor noted Combs had "real good motion," and some tenderness over the bicipital groove. He directed Combs to continue physical therapy, and added some modalities for his biceps tendon.

On April 20, 2005, Combs reported to Dr. Schenk that he had stopped taking OxyContin because it was causing him to feel confused. He was still taking Hydrocodone twice daily. He still complained of neck pain, and also complained of tension and pain in the back of his head in the occipital region. He stated his right shoulder was doing much better. Combs saw Dr. Stokesbary on April 21, 2005. The doctor noted Combs's shoulder was getting stronger, but still was only at about 75% strength compared to the

other side. Combs stated his neck was tense and quite sore, and Dr. Stokesbary ordered some cervical traction and physical therapy for Combs's neck.

At his physical therapy appointment on May 12, 2005, Combs stated his shoulder was "near 96% improved." He exhibited full functional active range of motion of his shoulder in all planes, and normal strength throughout. He was discharged from treatment for his shoulder, with therapy to continue for his neck pain.

Combs saw Dr. Stokesbary on June 2, 2005, for followup. He stated his range of motion was improving, but he still lacked a little strength. He was still having pain but thought most of it was related to his neck. The doctor scheduled a new FCE, noting Combs was at maximum medical improvement for his shoulder. Combs also complained of renewed pain about his left elbow, and the doctor administered another injection.

Combs underwent the FCE on June 14, 2005. The evaluator found Combs could lift up to thirty-five pounds occasionally and fifteen to twenty pounds frequently; overhead lifting limited to fifteen pounds or less occasionally; and avoidance of prolonged of frequent overhead work using his arms, and prolonged holding/reaching tasks requiring him to use his arms fully outstretched away from his body above shoulder height. He found Combs could sit, stand, reach forward, reach overhead, squat/crouch, walk, and perform repetitive leg/arm movements frequently, defined as 34% to 60% of the workday. He found Combs could constantly bend/stoop and balance. And he found Combs could climb, kneel, and crawl occasionally. Dr. Stokesbary reviewed the FCE results and concurred in the work restrictions as stated by the evaluator.

Combs continued to complain of ongoing neck pain, and he continued to receive physical therapy for his neck. On June 8, 2005, Combs reported his neck was feeling better and he was using traction at home. He continued to exhibit limited right cervical rotation, with crepitus. As of June 13, 2005, the therapist continued to note Combs's rehab diagnosis as "Impaired muscle performance, Impaired joint mobility, motor

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 22 of 48

function, muscle performance, range of motion an[d] reflex integrity associated with spinal disorders."

Combs returned to see Dr. Schenk on July 15, 2005. He complained of increased pain in his neck. He noted his physical therapy had been terminated three weeks earlier because he was experiencing dizziness during therapy. He no longer was having pain on movement of his neck, but instead the pain was throughout his neck. As of August 26, 2005, he was continuing to take Hydrocodone twice daily for his neck pain. By November 2, 2005, Combs was taking Hydrocodone four to five times daily with no relief. He stated his neck felt better when he was in traction, but as soon as he took the traction device off, the pain returned. He reported sleeplessness due to pain, and weight gain due to his inactivity. Dr. Schenk decreased Combs's Hydrocodone dosage, and prescribed Skelaxin and a cervical neck collar. She referred Combs to physical therapy, but apparently there was a problem with his insurance until after the first of the year.

As of March 15, 2006, Dr. Schenk noted Combs was "doing reasonably well physical wise," although he had gained more weight. The doctor opined weight loss of at least ninety pounds should be Combs's goal, and she opined that weight loss might help his chronic neck pain.

### 6.    *Depression and other mental health issues*

The record indicates Combs has had periodic problems with depression and rage since at least as early as 1988. Before his May 2002 injury, it appears Combs's depression and anger issues were treated adequately with medication. After his neck injury, and throughout the course of his ensuing medical treatment, Combs became increasingly depressed. He has contemplated suicide, and at one point even put a rope around his neck.

Progress notes from Combs's primary care physician, Dr. Schenk, indicate Combs frequently is tearful, angry and on edge, and his mood often is significantly depressed. The doctor referred Combs to a psychiatrist, and in December 2003, Combs began a long-

23

term counseling relationship with Michele Boykin, a counselor in the psychiatrist's office. Combs saw Ms. Boykin regularly from December 2003 through March 2006. Ms. Boykin's treatment notes indicate Combs has ongoing feelings of helplessness, hopelessness, and worthlessness due to his inability to be as active as he was prior to his injury, his ongoing pain and physical limitations, and his inability to work and support his family. He is prone to emotional outbursts and can become verbally abusive to those around him.

Combs's doctors have tried various combinations of medications to treat his depression. The frequent changes in medications and dosages indicate Combs's mental health issues continue to be problematic. As of March 15, 2006, he continued to take numerous medications relating to his mental health including Prozac (an anti-depressant), Wellbutrin (also an anti-depressant), Ativan (an anti-anxiety medication), and Restoril (an anti-insomnia medication).

Combs underwent a psychological assessment by Jim Snowden, Ph.D. on September 12, 2003. Dr. Snowden found Combs to be "suffering from a Major Depressive disorder of moderate severity which appears to be secondary to a chronic pain condition. . . . He has suffered an extreme loss of everyday functional capacity and reports [he] is in almost constant pain." He noted Combs's self-image is quite negative, and anger management likely is an issue for him. On standardized intelligence tests, Combs achieved a full-scale IQ of 80, with a verbal comprehension index of 76, and a verbal reasoning score of 80. Combs's test results fell in the Low Average range for the most part.

Dr. Snowden observed that Combs appears to be particularly concerned about his physical functioning. His physical problems have left him with "little energy or enthusiasm for concentrating on important life tasks and little hope for improvement in the future." He is constantly preoccupied with his health problems, and his self image is affected by his perception that he is somewhat handicapped due to his physical limitations.

Although Dr. Snowden indicated Combs's test results could be considered a valid indicator of his mental functional abilities, Dr. Snowden further noted that idiosyncracies in some of Combs's responses indicate Combs may attempt "to portray himself in a negative or pathological manner in particular areas." As a result, the doctor indicated Combs's test results "may overrepresent the extent and degree of his problems and symptoms in certain areas"; however, he failed to identify clearly what those areas might be.

On November 5, 2003, Myrna C. Tashner, Ed.D., performed a paper review of the record and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. She found Combs's allegations regarding his mental limitations not be fully credible, noting Combs "has limited his mental health treatment to prescribed meds from his [primary care physician]." She opined Combs would be able to understand and remember simple instructions, procedures and locations, not involving reading; he would interact appropriately with supervisors, coworkers, and the public; and he would be able to use good judgment. She indicated he "would have moderate limitations in concentration, attention and pace, as well as adapting to changes." She found no evidence that Combs ever had an episode of decompensation of extended duration. Herbert L. Notch, Ph.D. reviewed the record subsequently and concurred in Dr. Tashner's assessment.

On January 16, 2004, Michele Boykin, Combs's counselor, wrote a letter to the worker's compensation insurer in which she stated the following:

> Mr. Carl Combs is being treated in this clinic for Major Depression. Some of his symptoms are poor concentration and indecisiveness, isolation, irritability, and low self esteem. His emotional and mental health status is fragile at present making him, I believe unable to meet any requirements an employer might expect of an employee. It is my recommendation that he be given more time before he is asked to participate in a job search.

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 25 of 48

On April 14, 2004, Ms. Boykin wrote a letter to the state Disability Determination Services indicating Combs was "severely troubled with chronic pain that . . . both drains him physically and emotionally which causes him to have difficulty with concentration, comprehension, irritability, and isolation from others." Ms. Boykin opined Combs's chronic pain likely would interfere with his ability to use wise judgment in the workplace, and to relate productively with supervisors and coworkers.

On May 2, 2005, Combs's treating psychiatrist Kunal K. Patra, M.D. completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form regarding Combs. Dr. Patra based his opinions on a diagnosis of Affective Disorder, and he indicated Combs experiences disturbance in mood, emotional lability and impairment in impulse control, emotional withdrawal and/or isolation, anhedonia, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. He indicated Combs has mild restriction of his activities of daily living and difficulties in maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and he has experienced one or two episodes of decompensation, each of extended duration. Dr. Patra opined Combs would be moderately limited in the ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and in his ability to set realistic goals or make plans independently of others. He found little or no limitation in Combs's ability to remember locations and work-like procedures, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

26

Ms. Boykin completed a Mental Residual Functional Capacity Assessment form regarding Combs on June 20, 2005. She opined Combs would not be limited significantly in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She opined Combs would be moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. She further opined Combs would be markedly limited in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Ms. Boykin offered no opinion regarding several areas of Combs's mental functional abilities, noting those questions more appropriately should be addressed to Combs's treating psychiatrist.

## C. *Vocational expert's testimony*

The ALJ asked VE William V. Tucker the following hypothetical question:

> My first assumption is of we have an individual who's 46-years-old, he was 43-years-old as of the alleged onset date of disability. He's a male, he has a limited education and past relevant work has been indicated in [the Past Relevant Work Summary], and he has the following impairments: he has degenerative joint disease and degenerative disc disease at the cervical spine, impingement syndrome of the right shoulder, that is post surgery, coronary artery disease, that is post [INAUDIBLE] and very coetaneous coronary angioplasty, hypertension, obesity, diabetes, gastroesophageal reflux disease, major depressive disorder, substance abuse and sleep apnea, and as a result of a combination of those impairments and no other treatment prescribed for those, medication or other treatment prescribed for those impairments[,] [h]e has the residual functional capacity as follows: cannot lift more

27

than 35 pounds, routinely lift 15 to 20 pounds, stand or walk for six hours out of an eight hour day, sit for six hours out of an eight hour day, with no continuous bending or twisting of the neck, only occasional stooping, squatting, kneeling, crawling or climbing, only occasional work with the arms overhead. He is not able to do, or he's able to do only simple routine repetitive work that does not require constant, close attention to detail for use of independent judgment for decision making. He does require occasional supervision. He should have only occasional contact with the public. He should not work at more than a regular pace and that's using three speeds of [pace] meaning fast, regular and slow, and he should not work at more than a mild to moderate level of stress. Would this individual be able to perform any job he previously worked at, either as he performed it or as it is generally performed within the national economy, and if so, would you please specify which job?

The VE responded that the hypothetical individual would be unable to perform any of Combs's past work, and he would have no transferable skills. However, the VE opined the individual would be able to perform a wide range of unskilled, light work; for example, small products assembler, marker or laborer, and inspector and hand packager, all of which are classified as light work.

The ALJ then asked the VE a second hypothetical question, as follows:

My next hypothetical would be an individual of the same age, sex, education, past relevant work, and impairments as previously specified, and this would be an individual who would have the residual functional capacity as follows: he cannot lift more than 20 pounds, routinely lift five to ten pounds, standing of one and [a] half to two hours at a time, sitting of one half to three quarters hour at a time and walking of two blocks at a time, with only occasional bending, stooping, twisting of the neck, kneeling, crawling, pushing or pulling, or work with the arms overhead. This individual should not work in unprotected heights, he does require excess restroom facilities, he is able to do only simple routine repetitive work not requiring close attention to detail or use of

28

> independent judgment for decision making, with only
> occasional contact with the public, coworkers and/or
> supervisors, however, he does require occasional supervision.
> He should not work at more than a regular pace or more than
> a mild to moderate level of stress. I assume this individual
> could not return to past relevant work, transfer acquired work
> skills, or perform the full and/or wide, would this individual
> be able to perform the ful and/or wide range of work?

The VE responded that with the requirement of eliminating jobs involving regular public contact, the individual would not be able to perform a wide range of jobs. However, the VE continued to maintain that the jobs he listed with respect to the first hypothetical individual also would be appropriate for the second hypothetical individual.

Upon questioning by Combs's attorney, the VE indicated that if Combs "blew up at people, could not go out in public, . . . has occasional thoughts of suicide, has trouble concentrating, has trouble thinking, has limited ability to relate to other people, [and] has trouble reading things and understanding things," he would "have difficulty maintaining employment" and would "probably get fired."

Regarding an individual's mental status, the VE stated if an individual were moderately limited in his ability to function mentally on the job, that would not eliminate the types of simple, routine, repetitive work activity the VE had suggested in response to the ALJ's hypothetical questions.

### D.    *Other vocational evidence*

On April 13, 2004, rehabilitation specialist Patricia G. Conway, M.S. completed a Loss of Earning Capacity Analysis regarding Combs. Ms. Conway reviewed Combs's case file, and she also met with Combs on November 20, 2003, for a vocational interview. Ms. Conway noted Combs had applied for thirty-eight jobs between September 22, 2003, and November 16, 2003, but he was not seriously considered for any of those jobs. She indicated Combs's "employment opportunities have been significantly limited when considering his lack of education, low IQ and lack of transferable skills to light and

sedentary work activity." She opined Combs has lost 80% to 85% of his pre-injury earning capacity, and he is "an odd lot worker" who will not be competitive for employment. On April 27, 2005, Ms. Conway provided a second report in which she continued to opine Combs is not employable in the competitive job market.

On July 25, 2005, after Combs's ALJ hearing, Ms. Conway provided a supplemental report in which she disagreed with a labor market survey performed by Carol Reddy of Genex Services, in which Ms. Reddy had opined Combs could work as a janitor, light custodial, light delivery driver, courier, cashier, counter attendant, security guard, or light production/assembly worker. Ms. Conway reaffirmed her opinion that Combs is not employable in the competitive job market based on his "education, work history, lack of skills, physical and mental limitations and his extensive job search efforts."

Ms. Conway reviewed the ALJ's decision and wrote a letter to Combs's attorney in which she offered her "professional opinions regarding the vocational decisions made in this case." In her letter, Ms. Conway set forth her rationale for disagreeing with the ALJ's conclusion that Combs would be able to work as either a small products assembler or an inspector/hand packager, both of which, according to Ms. Conway, would require Combs to work with his neck in a downward posture most of the day. Ms. Conway indicated that of the three jobs cited by the VE, the only job that would be appropriate for Combs, and that would not violate the restrictions accepted by the ALJ, would be the job of marker/labeler. However, Ms. Conway questioned the validity of the definition of this job as outlined in the Dictionary of Occupational Titles, noting the publication has not been updated since 1984. She further questioned the VE's conclusion regarding the numbers of such jobs that are available in the local and national markets. Ms. Conway once again stated her opinion that Combs is not employable in the competitive market, either in Iowa or nationally.

30

*E.*     *The ALJ's decision*

The ALJ found Combs has not engaged in substantial gainful activity since his alleged disability onset date of May 20, 2002.  He found Combs has severe impairments including the following:

> [H]istory of one-vessel coronary artery disease and myocardial infarction status post PTCA of the left anterior descending with stent placement in August 1997; hypertension; obstructive sleep apnea; non-insulin dependent type II diabetes mellitus; obesity; chronic venous stasis changes in his left lower extremity with a remote history of thrombophlebitis; degenerative disc disease in his cervical spine; a history of a right shoulder injury, status post a right biceps tenodesis and acromioplasty on November 26, 2004; major depressive disorder; and a history of polysubstance abuse.

However, he further found Combs's impairments, individually or in combination, do not reach the Listing level of severity.

The ALJ found Combs's claim that he is completely disabled not to be credible, for the following reasons:

> First, his allegation is not supported by the objective medical evidence.  The claimant has degenerative disc disease in his cervical spine.  However, the radiological studies indicated that he did not have central canal stenosis or significant neural foraminal stenosis.  The EMB/nerve conduction studies performed on the claimant's neck and upper extremities were normal.  Although he exhibited symptoms of radiculopathy at times, those symptoms eventually resolved.  The claimant had a right shoulder injury and underwent right shoulder surgery.  However, the medical records indicate that the claimant has experienced improvement as a result of his surgery  The claimant has been treated for depression.  However, his treating psychiatrist indicated that the claimant's depressive symptoms are only moderate in their severity.  The WAIS-III results indicated that claimant has low average intellectual functioning.  He has performed skilled and semi-skilled work in the past.  The claimant has diabetes, hypertension, and

31

coronary artery disease. However, these conditions appear to be stable on the claimant's current treatment regimen. The claimant has left lower extremity thrombophlebitis. However, this condition has been controlled for the most part since 1984 through the use of a Ted hose. Although he experienced a recent flare-up of this condition, the most recent medical evidence indicated that the flare-up was rapidly improving. Second, the claimant's allegation is not supported by the results of the two valid FCE's performed during the relevant time period. The result of the two valid FCE's indicated that the claimant could perform work in the light-medium exertional category. Third, the claimant's allegation is not supported by the opinions of the claimant's treating psychiatrist or two of his treating physicians, Dr. Stokesbary and Dr. Giordano. Dr. Stokesbary and Dr. Giordano were the specialists brought in to treat the claimant's neck and right shoulder injuries. Both of them concluded that the two valid FCE's accurately represented the claimant's work-related limitations. Fourth, the claimant's allegation is not supported by the opinions of the state agency medical consultants or consultative examiner. Fifth, the results of the first FCE were considered invalid due to the claimant's symptom magnification behavior. He also exhibited some evidence of symptom magnification when he was examined by Dr. Snowden on September 12, 2003. He exhibited fair effort and minimal symptom exaggeration during the two valid FCE's. Sixth, the claimant was involved in a worker's compensation case during most of the relevant time period. The worker's compensation case was not settled until after the hearing in this matter. Seventh, the claimant engaged in drug-seeking behavior during the relevant time period. Finally, the claimant testified that he weighed 210 pounds as of May 30, 2002, and gained 62 pounds as a result of the inactivity caused by his neck and right shoulder injuries. However, the medical evidence indicates that the claimant weighed 263 pound as of February 25, 2002, and 261 1/2 pounds as of June 6, 2002.

The ALJ assigned significant weight to Dr. Giordano's opinion of May 12, 2003, in which the doctor concurred with the work-related limitations stated in the April 24,

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 32 of 48

2003, FCE conducted by Randy Presler, P.T. The ALJ assigned some weight to Dr. Burgfechtel's opinion of October 30, 2003, that Combs would have marginal ability to climb, stoop, kneel, crawl, perform repetitive neck movements, or lift overhead, and he could lift/carry up to thirty pounds occasionally. However, the ALJ noted Dr. Burgfechtel only examined Combs once, and he therefore found the doctor's opinion was entitled to less deference than the opinions of Drs. Giordano and Stokesbary and the results of the two FCEs.

The ALJ also gave the opinions of state agency consultants Dr. Weis and Dr. Hunter some weight, noting neither of them had examined Combs, and they did not have the benefit of all of the relevant evidence. The ALJ therefore found the state agency consultants' opinions also were entitled to less deference than the opinions of Drs. Giordano and Stokesbary and the results of the two FCEs.

The ALJ gave no weight to Dr. Schenk's September 13, 2004, opinion that at that time, Combs was completely disabled from employment, from a physical standpoint. The ALJ noted the determination of whether or not a claimant is disabled is reserved to the Commissioner. Further, he noted Dr. Schenk failed to provide any specific work-related limitations for Combs, and she did not define the time period of Combs's total disability. The ALJ found the doctor's opinion to be inconsistent with other substantial evidence of record, "including the opinions of the claimant's other treating physicians, the opinions of the state agency medical consultants, the results of the two valid FCE's, and the opinion of the consultative examiner."

The ALJ gave significant weight to Dr. Stokesbary's opinion that Combs has "a five percent right upper extremity and three percent total body impairment due to his right shoulder injury and surgery." However, he questioned the doctor's reliance on the June 21, 2005, FCE in determining Combs's permanent work-related limitations, noting

33

that Combs put forth only fair effort during that evaluation, and therefore the evaluation may underestimate Combs's true physical RFC somewhat.

The ALJ gave little weight to Dr. Schenk's August 26, 2005, opinion that Combs's neck pain precludes him from working full time, finding the doctor's opinion to be inconsistent with other substantial evidence of record. He also gave little weight to Dr. Schenk's opinion that Combs's diabetes, hypertension, obesity, and GERD had been exacerbated by his inability to exercise. The ALJ noted the medical records indicate Combs's hypertension and diabetes are under good control on Combs's medication regimen; his "weight has remained relatively stable throughout the relevant time period"; and there is little evidence regarding Combs's GERD in the medical records. The ALJ noted that as with her previous opinion regarding Combs's disability, Dr. Schenk had failed to cite any specific work-related limitations for Combs, instead merely stating that he was "totally disabled and could not perform a full time job."

The ALJ further gave little weight to Dr. Schenk's opinion that Combs suffers from severe depression, noting Combs's treating psychiatrist indicated Combs's symptoms fell within the mild to moderate range. In addition, the ALJ indicated Dr. Schenk's own treatment notes indicate Combs was sleeping better and his depression and anxiety were improving after she prescribed amitriptyline to help Combs sleep.

The ALJ gave some weight to the opinions of state agency consultants Myrna Tashner, Ed.D. and Herbert L. Notch, Ph.D. regarding Combs's mental residual functional capacity. The ALJ found the consultants' opinions to be consistent with the weight of the other record evidence. The ALJ gave little weight to the April 14, 2004, opinion of Combs's counselor Michele Boykin, L.I.S.W. that many of Combs's mental health symptoms are due to chronic pain. He found Ms. Boykin's opinion not to be consistent with other substantial evidence of record. He further noted that although Ms. Boykin is not a medical doctor, she had based her opinion "in large part on her assessment of the

34

claimant's level of pain." The ALJ similarly gave little weight to the June 20, 2005, mental RFC form completed by Ms. Boykin, finding the record evidence does not support her conclusions.

The ALJ gave the opinion of Combs's treating psychiatrist some weight in determining the mental portion of Combs's RFC. He noted the doctor failed to provide a narrative functional capacity assessment, and he also found certain of the doctor's conclusions not to be supported by the record. In particular, the ALJ found no support for the doctor's conclusion that Combs has experienced one or two episodes of decompensation during the relevant time period. The ALJ "conclude[d] that there is sufficient evidence to assess the claimant's ability to understand, remember, and carry out complex instructions. Due to the combination of the claimant's depressive symptoms and his low average intellectual functioning, the claimant is limited to performing only simple, routine, repetitive work that does not require him to pay constant close attention to details."

The ALJ made the following assessment of Combs's mental RFC:

> [T]he undersigned finds that the claimant's mental impairments cause him to have mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; and mild to moderate difficulties in maintaining concentration, persistence, or pace. The undersigned finds that the claimant has not had episodes of decompensation, each of extended duration.

The ALJ assessed Combs's physical RFC as follows:

> [T]he undersigned finds that the claimant retains the residual functional capacity to lift and carry up to 35 pounds occasionally and 15 to 20 pounds frequently. He can sit, or stand and/or walk for a total of about six hours each in an eight-hour day with normal breaks. He cannot continuously bend or twist his neck. He can occasionally stoop, squat, kneel, crawl, or climb. He can occasionally use his upper extremities to perform overhead work. He can only perform simple, routine, repetitive work that does not require him to

35

pay constant close[] attention to details. He cannot use independent judgment. He can have only occasional contact with the public. He requires occasional supervision. He cannot work at more than a regular pace. He cannot tolerate more than a mild to moderate level of work-related stress.

Based on his assessment of Combs's mental and physical RFC, the ALJ found Combs cannot return to any of his past relevant work. However, relying on the VE's testimony, the ALJ concluded Combs is capable of performing work that exists in significant numbers in the national economy. In reaching this conclusion, the ALJ gave no weight to the three vocational reports from Patricia G. Conway, M.S., citing the following reasons:

First, Ms. Conway did not specifically state all of the work-related limitations she assumed that the claimant has as a result of his impairments. However, it is clear that she believed that his impairments required him to alternate between sitting and standing or walking more frequently than what would be allowed during normal breaks. Although the April 2003 FCE indicated that the claimant should alternate positions intermittently during the work day to relieve pain, there is nothing in the record to indicate that the claimant cannot accomplish this during regularly scheduled breaks. Second, Ms. Combs [sic] heavily relied on the fact that the claimant had applied for numerous jobs without being hired by anyone in formulating her opinion. However, this assumes that an employer would have hired the claimant for one of those jobs in the absence of his impairments, which is an unwarranted assumption in light of the available evidence. Moreover, the issue of hireability is one expressly excluded from the disability equation under the Social Security Act [citations omitted]. Third, another vocational expert, Carol Reddy, provided a contrary report during the worker's compensation proceeding. The claimant did not submit this report. Fourth, Ms. Combs [sic] was hired by the claimant to provide vocational expert opinion evidence on his behalf in his worker's compensation proceeding. The vocational expert who testified at the claimant's Social Security disability

36

hearing was hired by the Social Security Administration to provide impartial vocational expert opinion testimony. Fifth, in her opinions, Ms. Combs [sic] focused heavily on the claimant's employability. However, as noted above, employability is not an issue in Social Security disability cases. Finally, Ms. Conway stated that the claimant was not competitive for employment in the general labor market [citation omitted]. However, she did not define what she meant by the general labor market. Current Eighth Circuit case law makes it clear that the relevant regional labor market is the State of Iowa.

Because the ALJ found Combs retains the capacity to work, he found Combs not to be under a disability at any time through the date of his decision.

## II. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, ___ F.3d ___, 2007 WL 2593631 at * 2 (8th Cir. Sept. 11, 2007); *Hillier v. Social Security Admin.*, 486

F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th

Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 39 of 48

there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433

F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (*Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 41 of 48

*Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 42 of 48

F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## III.  ANALYSIS

Combs argues the ALJ erred in three respects. First, he argues the ALJ improperly rejected the opinions of his primary treating health care providers. Second, he argues the ALJ presented overly simplistic, improper hypothetical questions to the VE. Third, he argues the ALJ erred in discounting Patricia Conway's vocational opinions.

Combs's arguments concerning his first two allegations of error overlap somewhat. He argues that because his primary physicians' opinions were disregarded, the ALJ therefore presented inadequate hypothetical questions to the VE, such that the VE's responses cannot be deemed to be substantial evidence in support of the decision that Combs is not disabled. Addressing first Combs's physical RFC, the court finds that any error by the ALJ in the weight he gave to Dr. Schenk's opinions was harmless. Two of

43

Combs's treating physicians, Dr. Giordano and Dr. Stokesbary, agreed with the limitations set forth in the report from Combs's June 2005 FCE. Notably, both of Combs's valid FCEs indicated he is able to perform light work. Though the court might have weighed the evidence differently, that is not the standard of review. *See Culbertson*, 30 F.3d at 939 (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court finds substantial evidence exists to support the weight the ALJ gave to Dr. Schenk's opinions.

Nevertheless, the court finds the ALJ erred in assessing Combs's physical RFC, and in failing to present a proper hypothetical question to the VE that contained all of Combs's limitations as supported by substantial evidence in the record. The second hypothetical question the ALJ posed to the VE contained physical limitations consistent with the June 2005 FCE in all respects but one. The ALJ indicated the hypothetical individual could "do only simple routine *repetitive* work." (Emphasis added.) Neither of Combs's valid FCEs indicated he is able to perform any type of repetitive motion on a continual basis.[3] However, on this record, it is not clear whether the erroneous inclusion of this functional ability was harmless.

Combs argues vigorously that based on the opinions of Patricia Conway, which were discounted by the ALJ, none of the jobs the VE identified could be performed by Combs. In particular, he argues the marker/labeler job requires repetitive movements on a continual basis. There is no evidence in the record to support that assertion. Even Ms. Conway, in her January 2006 letter, makes no statement regarding the physical demands of the marker/labeler job. The D.O.T. description of the job is silent on this point. Because the record does not indicate whether the marker/labeler job requires

---

[3]Notably, the court's interpretation of the FCE reports coincides with Combs's interpretation as set forth in his brief; i.e., that the failure to indicate *any* acceptable activities in the "constant" column of the form means the evaluator recommends Combs not perform *any* of the listed activities on a constant basis. The court rejects the Commissioner's semantic argument regarding the distinction between "constant" and "repetitive."

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 44 of 48

repetitive movements on a continual basis, the record is insufficient to determine whether it was harmful for the ALJ to include in the hypothetical questions the ability to do repetitive work. This insufficiency of the record ordinarily would require remand to obtain further vocational evidence based on a hypothetical that accurately describes Combs's physical functional abilities; i.e., a question containing the physical limitations set forth in the ALJ's second hypothetical question, omitting the ability to perform repetitive work. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001) (VE's response to hypothetical question based on incorrect RFC cannot constitute substantial evidence to support conclusion that claimant is not disabled; citing *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998)). However, as discussed below, the court finds remand is not appropriate in this case.

The above analysis relates only to Combs's physical functional abilities. Turning to his mental RFC, the court finds the ALJ erred in two respects: first, in failing to give proper weight to the opinions of Drs. Schenk and Patra, and second, in failing to develop the record fully and fairly.

From the time of Combs's injury in May 2002, forward, there is hardly an entry in Dr. Schenk's treatment notes in which she doesn't cite problems with Combs's mental health. She became increasingly concerned about his declining mental status, even postponing certain treatment recommendations because she believed Combs was not mentally capable of handling the therapy. She prescribed Prozac and Amitriptyline, and ultimately referred Combs to a psychiatrist and counselor. Dr. Schenk's position as Combs's long-term treating physician, who saw him frequently and regularly over a several year period, lends considerable weight to her assessment of Combs's mental condition, particularly where the doctor's observations are corroborated by Ms. Boykin's treatment notes from her counseling sessions with Combs.

Case 5:06-cv-04061-PAZ   Document 20   Filed 09/20/07   Page 45 of 48

With regard to Dr. Patra's opinion, the ALJ faulted the doctor for failing to complete the portion of the evaluation form that provides a narrative opinion regarding Combs's functional capacity. The ALJ further found "nothing in the record to support [Dr. Patra's] statement that [Combs] has had one or two episodes of decompensation during the relevant time period." An ALJ's duty to develop the record fully "'may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped.'" *Samons v. Astrue*, ___ F.3d ___, 2007 WL 2296416 at *4 (8th Cir. Aug. 13, 2007) (quoting *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006)).

The most troubling aspect of the present case is the claimant's mental condition. It is not surprising that the ALJ was unable to locate evidence in the 1659-page record to support Dr. Patra's assertion that Combs has experienced one or two episodes of decompensation; indeed, the court failed to locate support in the record for some of the ALJ's conclusions where the ALJ's citations to exhibits were inaccurate. (The same can be said for certain of the parties' arguments in their briefs.) The court finds the determination of the degree of Combs's mental impairment, and the resultant effect on his mental RFC, was critical to the decision in this case, and the ALJ erred in failing to seek clarification of Dr. Patra's opinions regarding his patient. *See* 20 C.F.R. § 404.1512(e)(1) (discussing Commissioner's duty to recontact treating physician to seek additional evidence or clarification); *O'Donnell v. Barnhart*, 318 F.3d 811, 818 (8th Cir. 2003) (citations omitted) (same). Again, however, the court finds remand to be unnecessary, as discussed below.

Although not raised directly by Combs, the court further finds the ALJ failed to make an adequate evaluation of Combs's credibility. Combs listed numerous side effects from his medications including confusion, fatigue, loose stools, frequent urination, and occasional incontinence. Treatment notes indicate Combs complained of these and other side effects to his treating physicians. Further, it is well known that the combination of

46

antidepressants and pain medications can result in sedation. *See, e.g.*, *Bowman v. Barnhart*, 310 F.3d 1080, 1084 (8th Cir. 2002) (recognizing that combination of Oxycontin and antidepressant can result in sedation; Skelaxin can cause drowsiness and nervousness; and Oxycontin is a controlled substance with the potential for abuse). The ALJ omitted an adequate discussion of the side effects of Combs's numerous medications, and how those side effects would impact upon Combs's daily activities and his ability to work.

Although the ALJ is not required to discuss each *Polaski* factor explicitly, *see Wagner v. Astrue*, ___ F.3d ___, 2007 WL 2403743 at *8 (8th Cir. Aug. 24, 2007) (citing *Goff*, 421 F.3d at 791), when one of the *Polaski* factors is particularly relevant to a proper assessment of the claimant's credibility, the ALJ errs in failing to examine that factor. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (ALJ is not required to discuss each *Polaski* factor methodically, "so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints."). In this case, the ALJ simply included standard language the court sees in most ALJ opinions regarding what *Polaski* requires. Merely citing the case and its requirements is insufficient. The ALJ failed to acknowledge or examine whether the dosage, side effects, and effectiveness of Combs's medications could have an effect on his ability to function in the workplace. The court finds this error to be of great importance in determining whether Combs retains the RFC to work.

Ordinarily, when the court finds errors of the type discussed above, the court will find it appropriate to give the Commissioner the opportunity to develop the record more fully, and to take another look at whether, based on a full and fair record, a claimant is disabled. *See, e.g., O'Donnell*, 318 F.3d at 818-19. In this case, however, the court finds the evidence is more than sufficient to render a decision without remand for further proceedings. The combination of Combs's severe mental and physical impairments is so

47

great that the court finds substantial evidence to conclude Combs is disabled. The Commissioner correctly points out that whether or not an individual is "employable" is excluded from the disability determination. *See* Commissioner's Brief at 21, citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566. Nevertheless, the record evidence proves Combs would be unable to "work full time in our competitive economy." *See Reed v. Barnhart*, 399 F.3d 917, 923-24 (8th Cir. 2005), and the cases cited by the *Reed* court. Substantial evidence of record proves Combs would be unable to maintain full-time employment.

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits).

Accordingly, the decision of the Commissioner is **reversed**, judgment will be entered for Combs, and this case is **remanded** pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 20th day of September, 2007.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

48